IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNY CHEN, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-3617 |
| | : | |
| AMTRAK, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.** October 17, 2019

Plaintiffs Jenny Chen and Brian Jordan filed this putative class action against Defendants Amtrak and RWC, Inc. alleging claims for nuisance, trespass, and negligence based on Defendants' spraying of herbicides along Amtrak rail lines. Plaintiffs filed the instant Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Because the Court finds Plaintiffs' experts unreliable, and Plaintiffs relied upon those experts to establish the Rule 23 requirements, the Court will deny Plaintiffs' Motion.

**FACTS[1]**

Amtrak contracts with RWC to receive vegetation management services. *See* Defs.' Ex. B–C (statement of work and specifications for vegetation management program). These services include applying herbicides to Amtrak's rail lines within Philadelphia County, Pennsylvania. *See* Defs.' Ex. D. The contract between Amtrak and RWC includes two different "post-emergent" spray brush programs: on-track and off-track. *See* Defs.' Ex. C, ¶¶ 13, 16. The spray programs include the spraying of AquaNeat—a herbicide—along the rail lines. *See* Defs.' Ex. E. Pursuant

---

[1] The Court makes these factual findings in furtherance of its obligation to conduct a rigorous analysis of Plaintiffs' Motion. The Court must resolve all factual disputes relevant to class certification, including disputes touching on the elements of the causes of action being asserted and the merits of the claims. *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir.2015). The Court must also make explicit findings that Plaintiffs satisfied their burden to prove each of the requirements of Rule 23 by a preponderance of the evidence. *Id.*

to the contract, RWC provided spray treatment services along the Amtrak rail lines in Philadelphia County on at least five occasions over three years from 2015 through 2017.[2] *See* Defs.' Ex. D.

The post-emergent on-track spray program provides for the "[a]pplication to spot treat any and all vegetation." *See* Defs.' Ex. C, ¶ 16. The post-emergent program also provides for "[f]ollow-up spot treatment as required." *See id.* The off-track spray program involves hand-spray application. *See id.* Although the spray treatment programs were made using trucks with large gallon tanks, neither of the programs involved the continuous spraying along the entirety of Amtrak's rail lines in Philadelphia County. *See* Defs.' Ex. E (describing use of freightliner truck, spray tank, and herbicides applied); Defs.' Ex. D (providing five daily field reports, three of which were post-emergent on-track spray treatment, two of which were off-track spray treatment).

Plaintiffs Jenny Chen and Brian Jordan live on Mantua Avenue in Philadelphia, Pennsylvania. *See* Compl. ¶ 16. Plaintiffs' home and backyard border Amtrak rail lines. *See id.* ¶ 18. Plaintiffs have an extensive garden in their backyard including herbs, fruits, and vegetables. *See id.* ¶¶ 19–20. On August 16, 2017, RWC, pursuant to its contract with Amtrak, applied AquaNeat "in certain adjacent areas of the right of way" of Amtrak's rail lines. *See* Defs.' Ex. E. After RWC's spraying, the garden in Plaintiffs' backyard began to wilt and present brown leaves. *See* Compl. ¶¶ 30, 33. After a few days, most of the garden appeared dead. *See id.* ¶ 30.

The Pennsylvania Department of Agriculture investigated the incident. The investigation found glyphosate—an active ingredient in AquaNeat—in Plaintiffs' soil. *See* Compl. Ex. B. The Department subsequently issued a notice of warning to RWC. The notice informed RWC the Department found the spraying constituted a trespass and violated 7 Pa. Cons. Stat. § 128.103(g)

---

[2] The parties have both stated RWC and Amtrak sprayed herbicides on six occasions over a three-year period, however, Defendants' Exhibit D provides only five "Daily Field Reports" on five separate dates. The Court thus finds the spray treatment occurred on at least five occasions.

because it resulted in unwanted residues on the property of another. Pls.' Mot. for Class Certification Ex. 2.

Plaintiffs filed this putative class action, bringing claims for nuisance, trespass, and negligence under Pennsylvania law. *See* Compl. ¶ 52–65. Plaintiffs now seek class certification and propose the following class:

> All owners and lessees of residential properties located within 100 meters of an Amtrak rail line in Philadelphia County, Pennsylvania.

*See* Pls.' Mot. for Class Certification 5. The class members would include the owners of approximately 3,454 residential properties along the Amtrak rail lines in Philadelphia County. *See id.* at 5. The Court held oral argument on the Motion on April 30, 2019. The Motion is now ripe for review.

**DISCUSSION**

The class action device is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). A party seeking to certify an action for class litigation must satisfy the four prerequisites of Rule 23(a) and establish the action can be maintained under at least one subsection of Rule 23(b).

Rule 23(a) requires plaintiffs to establish (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Pursuant to Rule 23(b), Plaintiffs here move for certification of their class under either of subsection (b)(2) or (b)(3). Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused

3

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that class action is superior to the other available methods for fairly and efficiently adjudicating the controversy."

Proper analysis under Rule 23 requires "rigorous consideration" of the evidence and arguments of the parties and the Court must make specific findings that each Rule 23 requirement is met. *See In re Hydrogen Peroxide Antitrust Litig* , 552 F.3d 305, 307 (3d Cir. 2008). The Third Circuit has emphasized that "actual, not presumed conformance" with Rule 23 is essential to class certification. *See id.* at 326 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). District courts must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. *See Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 214 (E.D. Pa. 2010), *aff'd*, 655 F.3d 255 (3d Cir. 2011).

"Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *See id.* (internal quotations and citations omitted). In considering the relevant evidence, the Court is required to consider expert testimony. *See id.* "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323.

In their Motion, Plaintiffs rely on the expert opinions of Dr. Lok R. Pokhrel and Esther Needham to establish both the numerosity and commonality requirements under Rule 23(a). *See* Pls.' Mot. 7. Specifically, Dr. Pokhrel concluded "properties within 100 meters of Amtrak rail lines and RWC, were exposed to glyphosate herbicide . . . consistent with the glyphosate exposure leading to the death of vegetation within Plaintiffs' property." *See* Pls.' Ex. 8, at 5. Using this

4

conclusion, Ms. Needham determined 3,454 residential parcels "intersect with a 100 meter buffer of Amtrak rail lines." *See* Pls.' Ex. 7, at 8. Defendants challenge both opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc* , 509 U.S. 579 (1993).

Because the Court must consider expert testimony at the class certification stage, the Court will first discuss the Plaintiffs' proffered experts before addressing the requirements of Rule 23. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (requiring courts to make a conclusive ruling on a defendant's challenge to experts before addressing Rule 23(a) factors) (citing *Messner v Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). "[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *Id.*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."[3] *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). To meet the "reliability" requirement, the expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.'" *In re TMI Litig.*, 193 F.3d 612, 664 (3d Cir. 1999) (citation omitted). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." *In re Paoli R R. Yard PCB Litig* , 35 F.3d 717, 746 (3d Cir. 1994).

---

[3] Defendants have not challenged, and the Court will not address, the experts' qualifications.

5

When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

Dr. Pokhrel's expert report describes his methodology as "a systematic scoping review of the publicly available scientific literature on *pesticide drift*, *drift distance*, and *potential toxicity*, with a focus on *glyphosate-based herbicides*." Pls.' Ex. 8, ¶ 9 (Pokhrel Rep.) (emphasis in original). He also conducted a sampling and analysis of the soils and vegetations from Plaintiffs' yard. *Id.* Other than these two tests, Dr. Pokhrel performed no samplings, calculations, tests, or experiments in making his conclusion.

Defendants argue Dr. Pokhrel's report fails to explain his basis or methodology for arriving at his 100-meter figure and is thus unreliable. The Court agrees. Because Dr. Pokhrel's opinion does not state a methodology used in calculating the 100-meter figure, there is no evidence or support demonstrating his opinion is reliable. Plaintiffs argued Dr. Pokhrel engaged in a rigorous literature analysis to arrive at his conclusion. Even so, Dr. Pokhrel did not provide any methodology, testable theory, or explanation of exactly *what* from the reviewed literature gave rise to his conclusion. For instance, Dr. Pokhrel did not state how the literature may relate to regular drift patterns, standard droplet size, or consistent spraying methods. His expert report, likewise,

6

failed identify any formula used to calculate the relevant drift distance. Dr. Pokhrel's opinion establishes a calculable number, yet, he has not explained how he reached his calculation.

Without Dr. Pokhrel's explanation of his calculation and methodology, a review of the literature Dr. Pokhrel relied on reveals even more questions as to how he reached his conclusion. For example, in *Children's Exposure to Chlorpyrifos and Parathion in an Agricultural Community in Central Washington State*, the researchers conducted a study to determine the levels of certain pesticides in house dust and in the urine of children who lived in specific proximities to agricultural land. *See* Pokhrel Rep. 29 ¶ 12 (Environmental Health Perspective 110:549–553 (2002)). Whatever information Dr. Pokhrel extracted from this study appears inapplicable to determining his 100-meter figure. Dr. Pokhrel does not explain how pesticide drift in the context of house dust and children's urine correlate or provide a reliable method for determining herbicide drift in contaminated soil. Finally, the method of pesticide application is not clear from the study. In some parts, the study discussed some families in which a parent had an agricultural job. In others, it discussed whether parents personally used pesticides in their own gardening. The unrelated pesticide applications in this study appear inapplicable to the facts in this case.

In *A Case-Control Study of Pesticides and Fetal Death Due to Congenital Anomalies*, the researchers discussed the relationship of pesticide exposure in expectant mothers to fetal deaths. *See* Pokhrel Rep. 29 ¶ 5 (Epidemiology 12:148–156 (2001)). The researchers noted they lacked certain meteorology factors that might have influenced the extent of drift in each mode of application. In *Dry Deposition and Spray Drift of Pesticides to Nearby Water Bodies*, the authors stated "[s]pray drifting during field spraying is influenced by a number of factors" including droplet size, boom height, driving speed, air-assistance, shielding, dose rate, crop development, wind speed, and temperature and humidity. *See* Pokhrel Rep. 29 ¶ 4 (Danish Environmental

7

Protection Agency – Copenhagen 1–171 (2003)). In a different article, *Spray Drift of Pesticides*, the researchers discussed both vapor drift and particle drift, droplet size, nozzle type, spray pressure, nozzle spray angle, wind speed, spray volume, wind direction, and several other factors which can influence pesticide drift. *See* Pokhrel Rep. 30 ¶ 17 (University of Nebraska, Institute of Agriculture and Natural Resources (2007)).

These articles, and others, support the proposition that several factors affect the extent and distance of pesticide and herbicide drift. Dr. Pokhrel discusses not one of these factors in stating his conclusion. Considering the numerous factors that may affect drift, it is expected Dr. Pokhrel would have explained which factors were present in the facts of this case, how those factors created numbers from which he made his calculation, and the ultimate calculation of those factor numbers. Dr. Pokhrel, however, did not.

Although Dr. Pokhrel's opinion listed almost thirty sources from which he conducted his literature review, the Court addresses the sources above as an example of the gap between the information provided and Dr. Pokhrel's conclusion. Dr. Pokhrel did not state what methodology he pulled from those sources, what information from those sources is relevant to the facts of this case, or whether a review of the literature is a generally accepted methodology in the field to determine drift in a specific case. *See Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 F. Supp. 2d 387, 405–07 (E.D. Pa. 2009) (finding expert unreliable after reviewing articles submitted to support expert's methodology). Dr. Pokhrel has provided nothing which could be submitted to peer review, and it is impossible to ascertain any rate of error in his calculation. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("Since [the expert] conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during this accident, he used little, if any, methodology beyond his own intuition."). Because Dr. Pokhrel

articulated no methodology in calculating his 100-meter conclusion, he has provided no standards which controlled his analysis and the Court cannot assess his method compared to other known methods or the non-judicial uses to which the method has been put. The Court thus finds Dr. Pokhrel's opinion was not established by reliable methodology. *See id.* (finding expert unreliable because he stated no methodology, conducted no tests, and failed to make certain calculations).

Plaintiffs also cannot rely on Dr. Pokhrel's report because whatever his methodology, it was unreliably applied to the facts in this case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742-43 (stating expert "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case'" (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)). Assuming Dr. Pokhrel's methodology from the relevant literature is reliable, the methods derived from the literature cannot be reliably applied to Defendants' application of herbicides. Defendants argue the literature reviewed discussed only aerial spraying of agricultural pesticides, as opposed to the ground-level spraying of herbicides at issue in this case. Plaintiffs argue "Dr. Pokhrel concluded that aerial spraying of AquaNeat—the process that killed plaintiffs' garden—would likely result in the deposit of the herbicide on all properties within 100 meters of rail lines subjected to the spraying." *See* Pls.' Reply 2. Dr. Pokhrel's methodology could not be consistently applied to Defendants' spraying because the record shows the spray treatment is done on the ground level and on at least three occasions the Defendants' application was spot-treatment spraying. *See* Defs.' Ex. C–D (contract and field reports indicating which spray pattern was used on each relevant date). Defendants' spot-treatment spraying addressed only visible vegetation obstructing the rail lines. *See* Defs.' Ex. C ("Post-emergent Programs – On track – Application to spot treat any and all visible vegetation.").

Dr. Pokhrel did not observe the rail lines at issue in this case such that he could determine what visible vegetation possibly existed during a spray treatment. Dr. Pokhrel also did not review any of the field reports to determine the timing or patterns of the spray applications. In Dr. Pokhrel's report, he did not reference with any certainty how the spot-treatment application of herbicides would affect his analysis. Considering the ad hoc nature of spot treatment spraying, the Court finds Dr. Pokhrel's application of his principles or methodology to the facts in this case unreliable. *See In re TMI Litig.*, 193 F.3d at 670 (finding experts evidence inadmissible because it lacked fitness and did not provide any true simulation of the accident at issue in the case).

The Court does not suggest, as Plaintiffs contend, Plaintiffs are required to sample every back yard along the rail lines in the county to establish the size of their putative class. The Court does require, however, a stated methodology from which it can assess the reliability of Dr. Pokhrel's conclusion and a more reliable application of that methodology to the facts in this case.

Considering Plaintiffs' second expert, Ms. Needham, relied solely on Dr. Pokhrel's 100-meter conclusion in her own methodology to reach the 3,524-figure, the Court likewise finds Ms. Needham's opinion unreliable.[4] Because the Court finds these two experts unreliable, Plaintiffs cannot rely upon their opinions in proving the Rule 23 elements.

Turning to the Rule 23(a) factors, Plaintiffs have failed to prove numerosity. Numerosity requires a showing that the class is "so numerous that joinder of all members is impracticable." *Marcus v BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012). "[T]he rule prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their

---

[4] The Court does not opine on whether the methodology employed by Ms. Needham is reliable absent its reliance upon Dr. Pokhrel's conclusion.

10

own claims." *Id.* at 594–95. The record must support the finding of numerosity. *See Center City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 209 (E.D. Pa. 2017) (stating a plaintiff must produce evidence "specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow a court to make a factual finding" (citing *Marcus*, 687 F.3d at 596)). Finally, numerosity must be proven by a preponderance of the evidence. *See Marcus*, 687 F.3d at 595.

The record shows RWC and Amtrak sprayed herbicides along the rail lines in Philadelphia County. It is likely some individuals within Plaintiffs' defined class have experienced some herbicide drift from Defendants' spray programs. Nonetheless, because Dr. Pokhrel and Ms. Needham's opinions are unreliable, the number of class members is speculative at best.

Aside from their unreliable expert opinions, Plaintiffs have presented no evidence demonstrating they meet the numerosity requirement. They produced no evidence showing where the post-emergent on-track spray treatment was applied based on its application to only *visible vegetation*. There is no evidence regarding how much visible vegetation existed at any given date of the spray treatments. Likewise, Plaintiffs have not presented evidence regarding how or where the off-track treatment spray treatments were applied and whether they affected numerous individuals. The record shows neither the on-track nor the off-track treatment entailed a continuous spraying along the entire rail lines in Philadelphia County—precluding a finding of numerosity based on every residential property along the rail lines. There is also no evidence regarding which properties along the rail lines are commercial or residential.

Even if some herbicide drift did occur in the same manner as in Plaintiffs' case, there is no support to ascertain, or even infer, the number of individuals who were subjected to any herbicide

drift due to Defendants' spray treatments.[5] Although it is possible others have experienced injury due to Defendants' alleged conduct, there is no evidence in the record showing those potential plaintiffs are so numerous that joinder is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Therefore, Plaintiffs have failed to meet their burden to establish numerosity under Rule 23(a). *See Center City Periodontists, P.C.*, 321 F.R.D. at 209 (finding plaintiff failed to establish numerosity because plaintiff could only speculate how many individuals actually purchased the product at issue).

Even if Plaintiffs had sufficiently proven numerosity, Plaintiffs have also failed to establish predominance of common questions pursuant to Rule 23(b)(3). Commonality is established when "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). Rule 23(b)(3)'s predominance element requires "[i]ssues common to the class [to] predominate over individual issues." *Gonzalez v. Cornig*, 885 F.3d 186, 195 (3d Cir. 2018) (alteration in original) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 313–14 (3d Cir. 2018)). At the class certification stage, predominance is established when the essential elements of the putative class claims "are capable of common proof at trial through evidence that is common to the class rather than individual to its members." *Id.* (citation omitted). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton*, 259 F.3d at 172.

"Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is 'far more demanding' than the latter." *Reinig*

---

[5] At oral argument, Defendants stated no other individual has come forward with a complaint regarding their application of herbicides along the Amtrak rail lines. While the Court does not rely on this statement in finding Plaintiffs failed to establish numerosity, it does suggest the size of the putative class is speculative and contradicts Plaintiffs' allegations of the "widespread nature" of Defendants' conduct. *See* Pls.'' Mot. for Class Certification 3.

*v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018). The two elements may be analyzed together "with particular focus on the more stringent predominance requirement." *Id.* Plaintiffs have proposed the following common questions of law or fact:

1. Whether Class members' properties were exposed to herbicide by Defendants' practices;
2. Whether Defendants' conduct constitutes a nuisance;
3. Whether Defendants' conduct constitutes a trespass; and
4. Whether Defendants' conduct constitutes negligence.

Plaintiffs argue the question of whether class members' properties were exposed to the herbicide will be proven by expert testimony and a review of Defendants' records. *See* Pls.' Mot. for Class Certification 9. Plaintiffs point to Dr. Pokhrel's report to establish the common proof they intend to use. *See id.* Because Plaintiffs cannot rely on Dr. Pokhrel's report, the Court disagrees his report can be used as common proof. To prove the presence of the herbicide on each class member's property, in this case, the evidence will likely need to be individualized. The record establishes Defendants' spraying was not continuous but was subject to spot treatment or by-hand application. *See* Defs.' Ex. D. Defendants did not spray the herbicides evenly along all the rail lines in the county. To show the presence of the herbicides due to Defendants' practices, Plaintiffs must provide individual proof of each class member's property and soil contamination.

Regarding nuisance, Plaintiffs argue the question of whether "freedom from herbicide contamination and destruction of vegetation on one's property [is] a private property right" is a pure question of law applicable to all class members. Although the Court agrees, the other questions on the class nuisance claim are individualized inquiries. A defendant is liable for nuisance if his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land and the invasion is (1) intentional and unreasonable, or (2) unintentional and

13

negligent, reckless, or an abnormally dangerous activity. *See Youst v. Keck's Food Serv.*, 94 A.3d 1057, 1071–72 (Pa. Super. Ct. 2014) (citing Restatement (Second) of Torts § 822). Whether Defendants actually invaded class members' private properties will require the same showing as establishing whether the herbicide is even present on class members' properties. The question of whether any invasion was unreasonable is likewise an individualized inquiry because Defendants' spraying was not done in a uniform manner. Herbicide drift may be an unreasonable interference on one property but not another. For example, Defendants may have excessively sprayed Plaintiffs' property because of the large tree on their property which encroached on the rail lines.

On the question of whether Defendants' conduct constitutes a trespass, the Court finds Plaintiffs have not established they can produce common proof. "[A] person may be liable for trespass 'if he intentionally . . . enters land in the possession of [another], or causes a thing or a third person to do so.'" *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 288 F. Supp. 3d 565, 586–87 (E.D. Pa. 2017), *aff'd*, No. 18-1137, 2019 WL 4463787 (3d Cir. Sept. 18, 2019) (citing Restatement (Second) of Torts § 158(a)). Plaintiffs assert they will establish the presence of the herbicide through expert testimony. *See* Pls.' Mot. for Class Certification 11. Plaintiffs state their "experts will show that the methods utilized by Defendants causes spray to drift onto properties within 100-meters of Amtrak rail lines." For the same reasons discussed above, at this stage, the Court will not consider Dr. Pokhrel or Ms. Needham's opinions as common proof to establish trespass. Rather, for Plaintiffs to demonstrate whether Defendants caused the herbicides to enter any class members' property will require Plaintiffs to sample each of the residential property's soil to establish (1) the herbicide is in fact in a class member's soil, and (2) Defendants' spraying caused the herbicide to be in the class member's soil. Although the Court does not require sampling of each property to establish numerosity, evidence as to whether Defendants' conduct—in

14

applying the herbicide on a spot-treatment basis—constituted a trespass necessarily requires a sampling of each class member's property. *See Rowe v. E.I. Dupont De Nemours and Co.*, 262 F.R.D. 451, 463–64 (D.N.J. 2009) (denying class certification for trespass claims because there were individualized inquiries regarding whether each property was contaminated and whether the defendant caused such contamination).

For Plaintiffs' negligence claim, the elements include (1) the defendant owed the plaintiff a duty, (2) the defendant breached the duty, (3) the plaintiff suffered actual harm, and (4) a causal relationship existed between the breach of duty and the harm. *See Adams v Wells Fargo Bank, N.A.*, No. 16-0907, 2017 WL 6619015, at *2 (E.D. Pa. 2017) (citing *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72 (Pa. Super. Ct. 2006)). Although, determining whether Defendants owed a duty to the class members and whether they breached that duty are common questions to all class members, they do not predominate over the individualized questions of causation and damages necessary for the class negligence claims as discussed below.

Despite any common questions on the nuisance, trespass, and negligence claims, Plaintiffs cannot prove causation for any of their claims on a class-wide basis. If the herbicide is present on all class members' properties, there is no common proof which will show the herbicide was present because of Defendants' spraying or the effect of such presence. *See Gates*, 265 F.R.D. at 233 ("Common evidence may offer one potential source of those contaminants, but many other explanations may exist that are specific to a particular property." (quoting *Fisher v. Ciba Specialty Chems Corp.*, 238 F.R.D. 273, 307 (S.D. Ala. 2006))). It is possible some proposed class members use the herbicide in their own yard for their own purposes, as Plaintiffs have alleged the herbicide is commonly known as "Roundup." It is possible the herbicide's presence arose from another source, considering the articles listed in Dr. Pokhrel's report stated many avenues for

15

contamination. The Court thus finds the issue of causation on the class claims is an individualized inquiry. Although there are some common questions, the Court finds due to the Defendants' ad hoc spray treatment, individual inquiries will predominate.

The Court recognizes Plaintiffs need only produce a "single common question" to meet the commonality requirement in Rule 23(a)(2). *See Wal-Mart Stores, Inc v. Dukes*, 564 U.S. 338, 359 (2011). Under the Rule 23(b)(3) requirements, the Court has nonetheless considered the dissimilarities between the putative class members to determine whether common questions predominate. *See id.* Although the Court is free to specify subclasses or certify the class as to certain common questions, the Court is under no obligation to do so *sua sponte*. S*ee Reyes*, 802 F.3d at 494 ("It is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the plaintiff who is required to submit proposals to the court." (citation omitted)). Because the Court finds Plaintiffs have not met the numerosity requirement, and Plaintiffs have not presented any potential subclasses, the Court declines to define any possible subclasses on the common questions for the Rule 23(b)(3) class.

Plaintiffs also seek certification of the class pursuant to Rule 23(b)(2) for injunctive relief. *See* Pls.' Mot. for Class Certification 6. Class claims under Rule 23(b)(2) must be cohesive. *See Gates*, 655 F.3d at 263–64. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. A party seeking certification under (b)(2) may be required to show more cohesiveness than a (b)(3) class. *See Gates*, 655 F.3d at 264.

The Court has the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances. *See Gates*, 265 F.R.D. at 230 (internal quotations and citations

omitted). "A court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it should under subsection 23(b)(3)." *Id.* Considering the Court finds significant individual issues exist precluding certification under Rule 23(b)(3), the Court likewise finds the individual issues preclude certification under Rule 23(b)(2).

Having found Plaintiffs have failed to establish at least one Rule 23(a) requirement, the Court need not address the other requirements under Rule 23(a), (b)(2), or (b)(3). *See Harnish v. Widener Sch. of Law*, 833 F.3d 298, 313 (3d Cir. 2016) (finding class certification inappropriate under the predominance requirement and declining to address the other requirements).

**CONCLUSION**

Because Plaintiffs have failed to establish numerosity, they have failed to meet their burden under the Rule 23(a) factors. Plaintiffs have also failed to establish the class action can be maintained pursuant to either Rule 23(b)(2) or 23(b)(3). Accordingly, the Court will deny Plaintiffs' Motion for Class Certification.

An appropriate order follows.

BY THE COURT:

Juan R. Sánchez, C.J.